[Cite as *In re J.N.L.H.*, 2022-Ohio-3865.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| IN RE: | : | |
| J.N.L.H. | : | CASE NO. CA2022-06-063 |
| | : | O P I N I O N<br>10/31/2022 |


APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. JN2020-0103


Mark W. Raines, for appellant.

Michael T. Gmoser, Butler County Prosecuting Attorney, and John C. Heinkel, Assistant Prosecuting Attorney, for appellee, Butler County Children Services

Jeannine C. Barbeau, for appellee, J.H.

Marcelina Woods, guardian ad litem.


**PIPER, J.**

{¶1} Appellant ("Mother") appeals the decision of the Butler County Court of Common Pleas, Juvenile Division, granting permanent custody of her child, J.H., to Butler County Department of Jobs and Family Services, Children Services Division ("the Agency"). For the reasons outlined below, we affirm the decision of the juvenile court.

**Facts and Procedural History**

{¶2} J.H. was born on December 4, 2007. Mother has not had custody of the child

since some point in 2008. In November 2019, J.H.'s father ("Father") obtained legal custody of the child due to Mother's inability to provide and care for the child's basic needs.[1] In March 2020, the Agency received a neglect and physical abuse allegation regarding J.H. and four of her half-siblings. Father and J.H.'s stepmother ("stepmother") were identified as the perpetrators of the neglect and physical abuse. Shortly thereafter, the Agency learned of domestic violence, substance abuse, and other concerning behavior by Father and stepmother in front of the children. At that point, the Agency filed a complaint alleging J.H. was a dependent child and requested temporary custody of the child. After a hearing, the juvenile court granted temporary custody of J.H. to the Agency. The child was initially placed in the care of nonrelatives, but was later placed with her paternal grandmother in June 2020.

{¶3} Thereafter, in July 2020, a hearing was held before a magistrate regarding the complaint's allegations. During the hearing, Mother indicated she was in agreement with the juvenile court finding that J.H. was a dependent child based upon the allegations in the complaint. As a result, J.H. was adjudicated dependent and continued her placement with her paternal grandmother.

{¶4} A case plan was created for Mother with a goal of reunification. The case plan states the Agency was concerned with Mother's ongoing issues with substance abuse and her mental health, as well as her inability to properly care for J.H. in the past. Mother also appeared easily triggered by stress, and was, at times, unable to cope appropriately without assistance. In order to address the Agency's concerns, the case plan required Mother to comply with the services identified in her existing case plan with the Agency

---

1. Father is the biological father of J.H. and four of her half-siblings. Father was involved in the case and case plan services initially, but later executed a surrender of his parental rights in favor of the Agency. As a result, Father did not appeal from the juvenile court's decision and was not involved in these proceedings. Because Father is uninvolved in the instant appeal, we will analyze the juvenile court's decision and findings only as they pertain to Mother.

concerning her son, and to comply with any other Agency recommendations. Notably, the case plan indicates Mother jointly developed and agreed with the plan; she was provided a copy of the case plan on June 11, 2020. On July 8, 2020, the case plan was adopted by the juvenile court as an order of the court, and Mother's counsel confirmed receipt of a copy.

{¶5} In late August 2020, paternal grandmother struggled to maintain appropriate housing, and J.H. was placed with another paternal relative for two days. On August 28, 2020, J.H. was placed with her paternal great aunt and uncle in Florida. Mother and the child's guardian ad litem ("GAL") objected to J.H.'s placement in Florida. J.H.'s great aunt and uncle were awarded temporary custody of the child from September 17, 2020 until December 13, 2020. At that time, they relinquished custody of the child due to behavioral concerns and as a result, J.H. was returned to the temporary custody of the Agency and placed in a foster home.

{¶6} Throughout the case, Mother displayed minimal efforts in working on her case plan services. She struggled to maintain sobriety and did not complete drug screens when requested. Mother did not participate in either substance abuse or mental health treatment and failed to maintain suitable housing. Although Mother was described as "compliant" with her case management services early on, she did not engage in case plan services or provide the Agency with any updates as to her alleged progress. In fact, there were extended periods of time throughout the case where the Agency had no contact with Mother and was unsure of her whereabouts.

{¶7} At a review hearing in September 2020, Mother's counsel requested the juvenile court to order visitation between Mother and the child. At that point, the child's attorney informed the magistrate that J.H. specifically stated she "only wants contact with [her parents] if they * * * test clean." J.H.'s GAL further advised the juvenile court that if J.H.'s parents were not participating in case plan services, J.H. was uninterested in contact

or visitation with them. After considering the parties' arguments, the magistrate issued an order giving J.H. the discretion to initiate video calls to Mother or Father. Mother and Father failed to maintain sobriety throughout the case, which resulted in minimal video calls between the child and Father, and no calls with Mother and the child.

{¶8} During a review hearing held on July 8, 2021, J.H.'s GAL requested the magistrate to find that Mother had abandoned the child. The GAL explained that, due to Mother's inability to complete any case plan services, Mother had not had contact with the child since the fall of 2020. As a result, the magistrate issued an order finding that because Mother had no contact with J.H. between January 1, 2021 and July 8, 2021, Mother had abandoned the child pursuant to R.C. 2151.011(C).

{¶9} In October 2021, Mother requested the juvenile court to reinitiate visitation between Mother and the child. At that time, the magistrate found that, because Mother had not been engaged in any case plan services, and no visitation had occurred between Mother and the child in more than one year, it was not in the best interest of J.H. to reinitiate visitation at that time. However, the magistrate explained that Mother could meet with the caseworker to discuss needed services and, in the future, Mother's visitation with the child could be modified if it was in the child's best interest to do so. Mother was then ordered to complete a drug screen the following day, which she failed to do.

{¶10} On October 6, 2021, the Agency moved for permanent custody of J.H. A hearing on the motion was held before a magistrate in March 2022. Mother, the child's foster mother, and the caseworker handling the child's case testified at the hearing. Father did not participate in the hearing, as he previously executed a surrender of his parental rights in favor of the Agency. The child's GAL also did not testify but engaged in cross-examination of the witnesses and filed a report with the juvenile court recommending that permanent custody be granted to the Agency.

{¶11} On March 7, 2022, the magistrate issued a decision granting permanent custody of the child to the Agency. In analyzing the best interest factors, the magistrate found that although Mother loves her child, J.H. is not currently bonded to her mother and has consistently reported that she does not want to have any contact with Mother. Despite requesting visitation with the child throughout the case, Mother's lack of sobriety and failure to complete drug screens hindered her from exercising visitation for much of the case. This was due to J.H.'s strong desire to only have contact when her parents were testing negative for illicit substances. The magistrate further found that Mother had not had contact with J.H. since she was in relatives' care in Florida and that Mother was found to have abandoned the child in July 2021.

{¶12} The magistrate further discussed Mother's relationship with J.H. and found that Mother is primarily focused on the perceived "inequity" when J.H. agreed to speak with Father prior to surrendering his parental rights, but would not speak with Mother. The magistrate noted that Mother fails to consider that Father was the custodial parent throughout the child's life, and that J.H. has never really had a relationship with her mother. As such, the magistrate declined to find that forcing contact between Mother and J.H. was in the child's best interest.

{¶13} The magistrate also noted that J.H. had been in the temporary custody of the Agency for 13 months at the time the Agency moved for permanent custody and that J.H.'s current foster placement was her fifth placement in the case. The four prior placements were with both relatives and nonrelatives; however, none of the prior placements provided the child with the stability she has found in her foster placement. J.H. has blossomed in her foster placement, is doing well in school, is involved in activities, and is happy and outgoing. J.H.'s foster mother testified that J.H. is bonded with foster mother and her fiancé, and that she is interested in adopting J.H.

{¶14} The magistrate further found that J.H. needs a legally secure placement, which could not be achieved without a grant of permanent custody to the Agency. The magistrate detailed Mother's lack of participation in the case, as well as in her case plan services, and noted that Mother's own actions have contributed to her lack of progress in obtaining custody of J.H. Mother failed to attend numerous hearings, failed to maintain her sobriety, and failed to update the Agency with progress related to her treatment. Mother also failed to maintain stable housing or address the Agency's concerns regarding her mental health. Thus, based upon Mother's behavior throughout the case, the magistrate concluded Mother had failed to rectify the concerns that led to the child's removal and that granting permanent custody to the Agency was in the child's best interest.

{¶15} Mother objected to the magistrate's decision, arguing that the permanent custody decision was not supported by sufficient evidence and was against the manifest weight of the evidence. Mother also argued the magistrate abused its discretion in allowing the child to decide whether she would visit with Mother throughout the case. After a hearing, the juvenile court overruled Mother's objections and adopted the magistrate's decision in its entirety.

**The Appeal**

{¶16} Mother now appeals, raising the following assignments of error for our review:

{¶17} Assignment of Error No. 1:

{¶18} THE TRIAL COURT'S DECISION TO GRANT BUTLER COUNTY CHILDREN'S SERVICES PERMANENT CUSTODY IS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE.

{¶19} Assignment of Error No. 2:

{¶20} THE TRIAL COURT ERRED WHEN IT FOUND MOTHER ABANDONED THE CHILD.

**{¶21}** Mother asserts the juvenile court erred by granting permanent custody to the Agency because its decision was unsupported by clear and convincing evidence and is against the manifest weight of the evidence. Mother contends the juvenile court erred in finding by clear and convincing evidence that Mother abandoned the child. Mother further contends some of the best interest factors weighed in favor of denying the Agency's motion. Specifically, Mother testified she has a secure placement the child could return to; the initial cause of removal related to Father; Mother completed multiple case plan objectives; and the juvenile court did not pursue whether the issues between Mother and the child could be mended.

**{¶22}** Before a parent's constitutionally protected liberty interest in the care and custody of his or her children may be terminated, the state must prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, citing *Santosky v. Kramer*, 455 U.S. 745, 769, 102 S.Ct. 1388 (1982). An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination. *In re M.B.*, 12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6. "This court will therefore reverse a juvenile court's decision to grant permanent custody only if there is a sufficient conflict in the evidence presented." *In re L.S.*, 12th Dist. Brown Nos. CA2019-03-001 and CA2019-03-002, 2019-Ohio-3143, ¶ 17, citing *In re K.A.*, 12th Dist. Butler No. CA2016-07-140, 2016-Ohio-7911, ¶ 10. "However, even if the juvenile court's decision is supported by sufficient evidence, 'an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence.'" *In re C.S.*, 12th Dist. Clinton No. CA2020-04-006, 2020-Ohio-4414, ¶ 15, quoting *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19.

{¶23} In determining whether a juvenile court's decision to grant a motion for permanent custody is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 12th Dist. Warren Nos. CA2018-08-088 thru CA2018-08-091 and CA2018-08-095 thru CA2018-08-097, 2019-Ohio-198, ¶ 16, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. "In weighing the evidence, there is a presumption in favor of the findings made by the finder of fact and evidence susceptible to more than one construction will be construed to sustain the verdict and judgment." *In re M.A.*, 12th Dist. Butler No. CA2019-08-129, 2019-Ohio-5367, ¶ 15, citing *In re C.Y.*, 12th Dist. Butler Nos. CA2014-11-231 and CA2014-11-236 thru CA2014-11-238, 2015-Ohio-1343, ¶ 25.

{¶24} Pursuant to R.C. 2151.414(B)(1), a juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9; *In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-5102, ¶ 18. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors set forth in R.C. 2151.414(D). *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. Second, pursuant to R.C. 2151.414(B)(1)(a) to (e), the juvenile court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child

in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio-3188, ¶ 12.

{¶25} As it relates to the second prong of the two-part permanent custody test, the juvenile court found the child had been in the temporary custody of the Agency for more than 12 months of a consecutive 22-month period at the time the Agency filed its motion for permanent custody. The juvenile court also found that Mother had abandoned the child, as she had no contact with J.H. between January 2021 and July 2021. Mother does not dispute that J.H. has been in the temporary custody of the Agency for more than 12 months of a consecutive 22-month period. Notably, this finding is supported by the record, as J.H. was deemed in the temporary custody of the Agency on July 1, 2020. The Agency's temporary custody was later terminated for 87 days while J.H. was placed with her relatives in Florida on September 17, 2020. J.H. was returned to the temporary custody of the Agency on December 13, 2020. Thus, when excluding the time J.H. was in the temporary custody of her relatives, J.H. had been in the temporary custody of the Agency for more than 12 months at the time the Agency moved the juvenile court for permanent custody of the child.

{¶26} On appeal, Mother generally claims the juvenile court erred in finding she had abandoned her child. As noted above, only one of the R.C. 2151.414(B)(1) findings must be met to satisfy the second prong of the two-part permanent custody test. *In re C.S.*, 2020-Ohio-4414, at ¶ 16. Because the juvenile court found by clear and convincing evidence that the "12 of 22" provision had been satisfied under R.C. 2151.414(B)(1)(d), its abandonment finding under R.C. 2151.414(B)(1)(a) was unnecessary to grant permanent custody. *Id.*

Thus, to the extent Mother claims the juvenile court's abandonment finding pursuant to R.C. 2151.414(B)(1)(a) was in error, we conclude Mother's argument is moot. In other words, because Mother failed to challenge the juvenile court's "12-of-22" finding on appeal and did not challenge whether the trial court's finding was supported by the record, we may affirm the juvenile court's decision regarding the second prong of the permanent custody test without conducting any further analysis. *In re C.P.*, 12th Dist. Brown No. CA2022-05-004, 2022-Ohio-3320, ¶ 27, citing *In re D.S.*, 12th Dist. Clinton Nos. CA2021-10-030 and CA2021-10-031, 2022-Ohio-998, ¶ 66; *In re R.D.,* 12th Dist. Clermont Nos. 2021-05-017 and CA2021-05-018, 2021-Ohio-3780, ¶ 24.

{¶27} In light of the above, the only issue remaining is whether permanent custody to the Agency was in the child's best interest. When considering the best interest of a child in a permanent custody case, such as the case here, the juvenile court is required under R.C. 2151.414(D)(1) to consider certain enumerated factors. *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 32. Pursuant to R.C. 2151.414(D)(1)(a) thru (e), these factors include, but are not limited to: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors listed in R.C. 2151.414(E)(7) thru (11) apply in relation to the parents and child. *In re J.C.*, 12th Dist. Brown No. CA2017-11-015, 2018-Ohio-1687, ¶ 22. "The juvenile court may also consider any other factors it deems relevant to the child's best interest." *In re A.J.*, 12th Dist. Clermont No. CA2018-08-063, 2019-Ohio-593, ¶ 24. No one factor is given greater weight

than the others. *In re S.H.*, 12th Dist. Butler Nos. CA2020-02-023 and CA2020-02-024, 2020-Ohio-3499, ¶ 30, citing *In re G.W.*, 12th Dist. Butler No. CA2019-01-003, 2019-Ohio-1586, ¶ 49. "Nor is any one factor dispositive." *In re M.G.*, 12th Dist. Warren No. CA2020-10-070, 2021-Ohio-1000, ¶ 29, citing *In re Bailey*, 11th Dist. Geauga No. 2001-G-2337, 2001 Ohio App. LEXIS 3294, *17 (July 20, 2001).

**{¶28}** Regarding factors one and two, Mother argues the juvenile court erred in its analysis, as there has been little done in the case to determine whether Mother's relationship with her child was worth preserving. Specifically, Mother claims the juvenile court should have attempted to repair the relationship between Mother and the child and should have explored whether Mother could be a "good option." In support, Mother points to the juvenile court's removal of the child to Florida over Mother's objection, which "eliminated an opportunity for Mother to have a meaningful relationship with her daughter," as well as the fact that Mother's requests for visitation were repeatedly denied.

**{¶29}** After a review of the record, we find no merit to Mother's claims. The record reflects J.H. repeatedly informed her GAL and attorney that she did not wish to have contact or visitation with Mother unless she (1) demonstrated sobriety and (2) engaged in case plan services. The child's concerns were communicated to Mother several times throughout the case; however, Mother did not remain sober and did not engage in case plan services. Although Mother testified she never missed a drug screen or tested positive for drugs throughout the case, the record reflects Mother missed drug screens in October 2021 and August 2020, admitted to heroin use in December 2020, and tested positive for amphetamines, methamphetamines, and THC in June 2020.

**{¶30}** The caseworker indicated that, as of March 2, 2022, Mother had not engaged in the necessary and beneficial case plan services. Mother, on the other hand, offered conflicting testimony regarding her progress on the case plan. At one point, Mother testified

she was not aware of the case plan services the Agency requested she complete, as she "originally wasn't going to be involved because [she] was in consent" with an aunt obtaining custody of J.H. Notably, the record reflects the aunt's home study was denied in May 2021, several months prior to the Agency's request for permanent custody of J.H. Later, Mother indicated there was nothing for her to do on a case plan, as she had obtained a job and completed "all [her] services in-patient, out-patient." Mother indicated she did not provide the Agency with the updated information because she "seem[ed] to collide a lot" with the former caseworker.

{¶31} Mother similarly provided conflicting testimony regarding her housing status. At one point, Mother testified she had rented a bedroom from a friend for two years. During that time Mother also placed a tent in her friend's backyard in order to appear homeless. Mother later testified she moved to a new home one month prior to the hearing, but provided no details or documentation of her new housing.

{¶32} After noting some of the inconsistencies in the testimony provided by Mother at the hearing, the juvenile court deemed Mother's testimony not credible. It is well established that issues of credibility are for the juvenile court, rather than this court, to determine. *In re G.N.*, 170 Ohio App. 3d 76, 2007-Ohio-126, ¶ 24 (12th Dist.). The juvenile court had the opportunity to view the witnesses and observed their demeanor, gestures and voice inflections, and used these observations in weighing the credibility of the testimony. *In re B.J.*, 12th Dist. Butler No. CA2011-10-192, 2012-Ohio-3127, ¶ 20; *In re C.B. et al.*, 12th Dist. Butler Nos. CA2008-01-002 and CA2008-01-003, 2008-Ohio-5543, ¶ 18. Accordingly, we find no error in the weight the juvenile court gave to Mother's alleged and uncorroborated case plan progress.

{¶33} Given Mother's clear refusal to make progress on her case plan and lack of consistent sobriety, we likewise find no error in the weight given to the child's wishes and

the child's best interest. Although Mother believes the juvenile court should have done more to foster the relationship between Mother and J.H., the record reflects Mother herself was unwilling to make any behavioral changes to better her relationship with her daughter. Her unwillingness to and disinterest in working on the case plan demonstrates her lack of commitment to obtaining custody of J.H. The foster mother testified that J.H. is in therapy and, due to experiencing a mental breakdown in January 2022, the child began seeing a trauma therapist. The caseworker similarly explained that J.H. has been hurt "a lot" by Mother's actions over the years. Accordingly, when considering the significant hurt and trauma J.H. has already suffered, it is evident that forced visitation between Mother and the child was not in the child's best interest.

{¶34} We also are unpersuaded that others are responsible for Mother's lack of contact and visitation with the child throughout the case. Instead, the record reflects Mother's own shortcomings and actions were the primary barriers preventing visitation with J.H. As noted above, the magistrate encouraged Mother to contact the Agency and to discuss the beneficial case plan services that needed to be completed in order to have visitation with the child. To streamline that process, the juvenile court instructed Mother to complete a drug screen and to follow up with the Agency. Mother elected to do neither. As such, it is clear Mother had the opportunity to partake in services that could lead to the ability to visit with the child, but Mother refused to take advantage of the opportunities extended. Accordingly, we conclude factors one and two clearly weigh in favor of granting permanent custody to the Agency.

{¶35} Regarding the custodial history of the child and the child's need for a legally secure permanent placement, we find these factors also weigh in favor of awarding permanent custody to the Agency. Although Mother expressed a desire to obtain custody of J.H., she also indicated she did not participate in case plan services because she

believed an aunt was receiving custody of J.H. Mother's failure to participate in the case or to remedy any of the Agency's concerns regarding her ability to care and provide for J.H. evidence her lack of commitment to obtaining custody of the child. As this court has previously recognized, "'[a] child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.'" *In re I.C.*, 12th Dist. Clinton Nos. CA2022-04-010 thru CA2022-04-012, 2022-Ohio-3101, ¶ 45, quoting *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 60. Mother has not demonstrated any ability to provide J.H. with such an environment. On the other hand, and according to Mother's own testimony, J.H. is thriving in her foster home, which is "the first time that [J.H.] been able to live as a normal child, not being responsible for younger brothers or sisters, * * * not carrying so much chaos on her shoulders at such a young age or * * * growing up faster than what she needs to."

{¶36} During the Agency's long history of involvement with Mother and J.H., Mother was given many opportunities to demonstrate an ability and commitment to care and provide for J.H. Mother has failed to take advantage of those opportunities. The child needs a legally secure placement and stable environment with consistent nurturing. Mother has demonstrated she cannot provide such an environment within a reasonable time. At the time of the permanent custody hearing, the child had been out of the home for nearly two years and was in her fifth placement. J.H. has finally gained the safety and stability she needs since being placed in her current foster home. As such, the third and fourth factors weigh in favor of granting permanent custody to the Agency.

{¶37} Lastly, we reject Mother's challenge to the juvenile court's finding under R.C. 2151.414(B)(1)(b) that she abandoned the child. A child is "presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that

period of ninety days." R.C. 2151.011(C). In finding the child abandoned, the juvenile court stated that Mother "has had no contact with the child from January 1, 2021 until March 3, 2022, a period of more than ninety days."

**{¶38}** Mother does not dispute that more than 90 consecutive days had passed since she had seen the child and admits that her last contact was while J.H. was placed with relatives in Florida between September and December 2020. Mother nonetheless argues that a parent cannot be found to have abandoned her child when a court order prevents visitation with that child. However, Mother's argument is incorrect.

**{¶39}** Mother has never presented a reasonable explanation for her lack of contact with her child. Although Mother was initially not provided court-ordered visitation, she had the opportunity to have visitation if she complied with case plan services and worked with the Agency. Mother chose not to do so. Mother failed to make *any* progress on her case plan from the time J.H. returned from her placement in Florida until the permanent custody hearing in March 2022. There were no meaningful efforts to work with the Agency to facilitate visitation with the child. Therefore, Mother's lack of visitation lies with her and no one else.

**{¶40}** When considering whether a child is abandoned, as that term is used in R.C. Chapter 2151, other courts have considered whether the parent demonstrated an intent to relinquish their parental rights of custody permanently. *See In re B.J.,* 12th Dist. Warren Nos. CA2016-05-036 and CA2016-05-038, 2016-Ohio-7440, ¶ 34, citing *In re C.E.,* 2d Dist. Champaign No. 2005-CA-11, 2005-Ohio-5913, ¶ 2. As noted above, Mother testified she was initially uninvolved with case plan services and the court proceedings, thereby voluntarily hindering her ability to receive court-ordered visitation with the child, because she agreed with an aunt receiving custody of J.H. Such testimony is indicative of Mother's intention to relinquish her custodial rights of J.H. permanently. Subsequently, Mother's

demonstrated conduct reveals a withdrawal from a parent-child relationship. The significant lack of follow through is indicative of more than just noncompliance.

{¶41} Moreover, despite Mother's inability to visit with J.H., R.C. 2151.011(C) does not limit a finding of abandonment to lack of visitation. Rather, the statute addressing abandonment also includes a failure to maintain contact with the child. Mother was not prohibited from otherwise maintaining contact with the child via gifts, mail correspondence, or other forms of contact outside of court-ordered visitation. Thus, despite her ability to do so, the record reflects Mother chose not to maintain any contact with her child throughout most of the case. Under these circumstances, we find no error in the juvenile court's determination that the child was abandoned as contemplated by R.C. 2151.011(C) and 2151.414(B)(1)(b). *In re B.J.* at ¶ 31-36.

{¶42} Considering the foregoing, we conclude that it is in the best interest of the child for permanent custody to be awarded to the Agency. As such, we find the juvenile court's decision to grant permanent custody of J.H. to the Agency was supported by clear and convincing evidence and was not against the manifest weight of the evidence.

{¶43} Accordingly, Mother's assignments of error are overruled.

{¶44} Judgment affirmed.

M. POWELL, P.J., and S. POWELL, J., concur.